May it please the Court, this appeal, judges, involves the interpretation of modifications to a Chapter 11 plan for Mortgages Ltd. And those modifications resolved the Rev-Op Group's objections to confirmation of that plan. Prior to those modifications, the plan was objectionable to us, and that is because it failed to address significant questions regarding the repayment of a $20 million exit financing loan. Before we get to those very important issues, we do have a proposal that we dismiss this case for equitable mootness. Correct. If you don't win on that one, this other is going to be irrelevant, so I hope you'll save a lot of your time for that. Fine. I will do so, Your Honor. I appreciate that. Yes, the threshold issue, if you want to call it that, with respect to mootness, Your Honor, we don't think that these cases are moot, and we don't think so because effective relief can be fashioned in this case in a number of ways. The argument that it's moot is really not that it's an Article III mootness, that it's not constitutionally moot. Certainly there's a lot of controversy here, and that controversy is ongoing. The argument is that it is equitably moot, and the standard for equitable mootness in this particular setting is not crystal clear. The Thorpe decision does provide some guidance, but I would note that the Thorpe decision was an actual appeal from a confirmation order itself. Here we have a slightly different fact background where there's no contest, there's no dispute that the plan has been confirmed. What we're trying to understand, or what we've tried to understand below, is what that plan means. How should that plan be implemented? And so we get we don't have a lot of cases on this. But Bruce Thompson started it off. He would say you struck out on the first point. You did not ask for, and therefore you're out. We haven't been clear, but at least in the starting point, his idea was if you don't ask or try to do something yourself to protect yourself, then equity is going to penalize you. How do you distinguish Judge Bruce Thompson's case? That's the Robert Farms decision, as I recall. Robert Farms, yeah. The Robert Farms decision really was a different case altogether. That case dealt with, as I recall, then section or rather Rule 805. This was under the Bankruptcy Act. And Rule 805 under the Bankruptcy Act really required a stay pursuant to the expressed terms of that rule. It said absent a stay following a sale, you're out of luck. That concept, when the Act became the Bankruptcy Code, was transmuted a bit. It moved from Rule 805, which became Rule 8005. And those provisions saying if you don't get a stay, things are mooted out, actually moved into the code itself. And specifically in section 363 and I believe section 364, which pertains to postpetition financing. So Robert's Farms really dealt with a number of issues. One of them was a kind of statutory mootness based on specific provisions in Rule 805. And he was correct in saying, look, if you don't comply with Rule 805, you don't seek a stay, then the rule says what it says. Here we don't really we're not dealing with those kinds of provisions. This is not a section 363 case. And Rule 8005 that was amended from Rule 805 makes the stay really not part of the calculus. Now, case law makes stay a factor, but it is only one factor in the total analysis. And under the Thorpe decision from this Court, a more recent decision, obviously, than the Roberts Farms decision, that failure to get a stay, obtain a stay, is not fatal. It is one factor. I'd like to call your attention to something that concerns me in relationship to your analysis, and that's the statement that is critical where the analysis takes place where he says, if a stay, the case says, if a stay is not sought and not  gained, then there's a standard that's set up. But the sentence above that says, we endorse the test of those framed in the circuits that have expressed the standard. We will look first to whether the stay was sought, for absence of a party has not fully preserved its right. It may not – it was not sought and was not gained. We will look to. So they look to the standards after it's sought and not gained. Then there's a standard that's set up. But there seems to be a gap where it could be interpreted, if you don't ask, we don't get to the standard. Could you talk to me about that? That's a little unclear. My pleasure, Judge. And I assume you're still looking at the Roberts Farms decision? No, no, no. You're now looking at the Thorpe decision? I have moved over to Thorpe, and I wished I had the page numbered. I will quickly get it for you. It's on page 881, where it begins, we endorse a test similar to those framed by the circuits. And you'll see on there, if you can find that, you'll see on there that we look first to whether a stay was sought for absence that a party blah, blah, blah. If one is sought but not gained, then it sets the standard. So it looks like it's still with the initial case that if you don't ask, you're out. But if you ask and it's denied, we have a standard. Now, your argument is if you don't ask, there's a standard that you apply. And that's where I'm having a problem. Okay. Let me address that, Judge. And I agree, if that were the case. I hope that was clear. I know it's confusing. No, I understand. Okay. If that were the totality of the case, if the case ended there, I think that that would be the analysis, that the rule laid down is that if you don't seek a stay, you're struck out. It strikes one, two, and three. You're out. But the Thorpe decision goes on from there. And it says that, and I'm trying to have the case pulled so I can point you to the exact language. But it says that this is one factor. And it goes on to say it's not even the most important factor, that obtaining a stay is not fatal. That's in Thorpe? That is in Thorpe, Your Honor. And also, Judge, for context, let me see if I can get a hand at the decision here. I think you're referring to the analysis that's on page 881 in the paragraph that starts, first, this is not a case for appellants, et cetera. It does say there, in referring back to Robert Farms, that failure to seek a stay can render an appeal equitably moot. However, failure to obtain a stay does not require a conclusion. That's the language you're referring to. Correct. And the key word there, I think, is can. It doesn't say shall.  It doesn't say must. It can render it moot. And so let me provide some more context. My clients, and this whole issue came up shortly after plan confirmation. Plan was confirmed in June of 2009. We're back in front of the Court three months later saying, gosh, the plan left a lot of decisions to be made post-confirmation. There are now significant disputes about how those decisions are made and what some of the plan language means. So in that context, my clients brought a motion for clarification to the Bankruptcy is what we're calling the exit financing order. That was in approximately October of 2009, late October of 2009. At that time, there were not happy times in Arizona in terms of the economic outlook. My clients had huge portions of their net worth, some of them substantially all portions of their net worth, tied up into these assets. And at that time, the exit financing order really didn't do anything other than to provide a preliminary pronouncement that the exit financing could be surcharged. It didn't surcharge my clients, and we knew that that would come later. It didn't give ML Manager authority. In fact, it said, that's not even before me. I'm not determining whether ML Manager has authority. So there was really nothing to stay other than a preliminary pronouncement. So now flash forward more than a year where ML Manager does file its allocation and distribution motion. There, the rubber meets the road and we do have the real threat, the concrete threat of surcharge. But by that time, the declaratory judgment action had occurred, which you'll hear about in the next appeal. And in that context, we had gone and sought a stay, and we had spent considerable resources trying to get a stay from the Bankruptcy Court, trying to get a stay from the District Court. And the requirement that was imposed was that we were going to have to put up an $80 million, $90 million bond, which my folks simply did not have the resources to do. And at that time, bonds were not even 10%. I mean, you'd be lucky if you could get 25. Most of the time, you had to collateralize them with nearly 100%. So coming up with a bond as a requirement did not seem valid. That's in the other case. The $80 million, $90 million bond was what the District Court was going to require in the other case. Correct. Now, not here, because you're only talking about your proportional share of the costs. Right? So if you'd had a bond here, what kind of costs were imposed on you? What kind of bond would you have had to have provided here? Well, what was your share of the costs? We didn't know. Do you know now? We didn't know. We still don't know. You don't have some parameters? Less than $10 million? Less than $1 million? We have some parameters based, and it changes. The share of the exit financing itself, we have not been able to unpack that particular number. So what happens is, in the allocation model, you have what's called the capitalized term total estimated costs. Under that rubric, you have generalized costs that cut across all of the loan assets, and you have a portion of that that's the exit financing. We haven't been able to unpack that. Is the exit financing capped at roughly $20 million, which is the amount of the loan? It is not, and that's another problematic aspect. There was a default of the exit financing. And as a result of that default, a principle was added. They borrowed another close to $2 million, at least $1.5 million, and so it actually increased. There were also additional points that were given every six months. They called them incentive payments. They were really just additional loan fees that were paid. And so it's not $20 million. It's something well in excess of that. And what percentage of that $20 million do your clients hold? What percentage of the total of the property do they have? Out of the loan portfolio, and, again, this is a little indistinct because we're not quite sure, but between $800 million and $900 million loan portfolio, we had about $50 million. So roughing out that math, you could come up with a percentage. But even that size bond, Your Honor, really we were in no position to do. Right. But $50 million was the value of the loan portfolio, not the value of the cost that would be associated with selling those properties. And that's all you're talking about here. Right. And while all I'm saying is that in terms of roughing out the math and rough percentage, of the $900 million portfolio, we had $50 million. Okay. And tell me what that percentage would be roughly. I was told there would be no math today.  It's less than 10%. It's less than 10% of the overall. Okay. So if you had to provide a bond on roughly $20 million, you would have had to have had a $2 million bond, which is considerably less than the $80 million to $90 million bond, which is what's at stake in the other case. If that were the bond that were imposed. But, again, when we were seeking a bond in the other cases, it was with respect to two properties and an agency agreement. And the argument that was advanced and the argument that was actually espoused there was that we imperiled the entire operation, that everything would fall apart, that Armageddon would come, and that the entire operation would fall. And that's why the bond was so sizable in that case. Your Honor, I note I've got about two minutes left. I'm happy to use that. Let me just ask you one more question on this subject. Sure. And I realize we're taking a lot of the time on the mootness issue. But even though you were discouraged to apply for a stay based on the analysis you just went through, did you ever seek some review of the size of the bond that was required in the other case or in what you thought would be a similar burden in this, in the appeal of these cases? We did not appeal the order denying our motion for a stay pending appeal, if that's what you mean. We did not do that. So this Court really never had a chance to weigh in on that at all until after all these sales have been completed. And now we know from the other motion that's pending to supplement the record that a number of other sales have also been completed. Have you objected to those sales? We have objected. Or appealed them? We have objected to a number of those sales. We have appealed some of those sales as well. And we've tried to keep those balls in the air. But there came a point, obviously, as well, where we thought the sales, we consistently objected to all of them, we haven't appealed all of them, but we're preserving our rights. And I wish I could continue talking about this. I'm almost out of time. And I would like to reserve just a minute on rebuttal. I'll make sure that you have some time on rebuttal, counsel. Thank you. Good morning, Your Honor. Kathy Reese from Fenimore, Craig and Phoenix, on behalf of ML Manager, the appellee. This case has been going on so long that I now not only need readers, but I have four new grandchildren. And the case, you know, has just gone on forever. And I think that's the point of the mootness argument. They didn't even try to get a stay pending appeal on either the motion to clarify or the distributions. They didn't apply. If we only had the first case, they struck out. But then we have the second case, which we have to interpret. That is, is the analysis in the second case one in which even when you strike out, there's something that can be done. And then to complicate the matter, and I just wanted my problem to be before you, is then we have a Sutter and Platinum, which seems to indicate that what we said in the first two cases may be modified. Now, I understand that when you have a circuit as big as ours, we have stray cases that come along, but we still have to attack them. So taking they never tried, and if we had been back with the original case, they would have struck out. But when they don't ask, does our cases still allow them to fight against equitable mootness on some scale that's graduated? That is, an analysis of certain situations we won't grant equitable mootness. It isn't struck out, as it said in the first. It's struck out maybe, depending upon circumstances. So if you can put those two cases together with Sutter and Platinum and how that supports your position, I'd be grateful. Well, the ‑‑ if you go past the first issue, which is whether they tried or not, and you move on to the second issue as to what other factors might be considered, then if we could look at those factors, I think they equally support an argument that this case should be moot. You still hold on to the position that you don't look to the factors unless they ask for it and it's denied, I take it? That is a reasonable interpretation of Thorpe. They didn't try, so you don't need to go further. But even if you go on to the additional factors, I don't think it injures our motion for mootness. Okay. Because we ‑‑ because when you look at what the additional factors are, they are all applicable here. I mean, the second factor that you were to look at was substantial consummation. And that's just a word that's used in the Bankruptcy Code, but it really indicates and gets to the heart of the fact of whether or not all the things that have been committed to be done are starting to be done. You don't have to complete everything in your plan, you just have to substantially do that and you have to substantially transfer the assets. And so in the original affidavit ‑‑ I mean, people have been harmed because they've gone on and sold properties and it would be difficult to unwind them and those kinds of things? Well, that is the next factor after substantial consummation. I mean, under the Bankruptcy Code, substantial consummation is a word that is applicable. I mean, it is used for the final decree. You get your final decree in a bankruptcy case when you've had substantial consummation. And so that's why I used the phrase substantial consummation here. Even the district court ruled that this had been substantially consummated, the plan and the various transfers. That's why in the affidavit that we had Mr. Winkleman sign and in the additional entries in the docket, there are almost 4,000 entries. How hard would it be to unwind this one? In the next case, I think it's a very, very different problem because you have lots of folks who were never parties to the ‑‑ never worked with ML. But these are all folks who are internal to the ML scheme. And we're just talking about an allocation of costs. How hard is it to unwind? Mr. Suzuki tells us he doesn't even know how much he's going to get charged here. Well, I think that is a ‑‑ that's what we tried to put in our motion in the affidavit. If you look at Mr. Winkleman's affidavit, there are significant things that have been accomplished. And the question is, what would you have to unwind? At this point, we've already had six distributions of money. And so we have, through those six distributions, distributed, and we've already sold almost $200 million of property. Sure. Now, on the distributions of money, that's distributions from the sale of money and you've charged some kind of cost of administration against those distributions. Is that right?  That's true. There's a lot more things that have ‑‑ that come out of that money. But, yes. I mean, when you think about it, at every sale, there are various creditors that are paid, whether they're mechanics sling holders, tax sling holders. And so at every sale, you pay a certain group. And then once you get to a net number ‑‑ Well, let's suppose ‑‑ let's suppose that we agreed ‑‑ we agreed with Revop on the merits here, on the interpretation of paragraph U, and decided that the bankruptcy judge was wrong on that. What would have to happen? You'd have to go back to other ML clients, other participants in the ML scheme, and say we charged you for these costs of administration and you're going to have to pay an additional fee. But all of these folks were ML participants. So how hard is that to do? I mean, this is a discrete group. These are folks that some of this stuff is still in flux. This is unlike the next case, which I think presents much more vexing issues. There have been over 1,500 investors who have received money. And as Mr. Winkleman said in his affidavit, some of those investors are only in a few loans. So to the extent that they've already been paid their net distribution of proceeds, then what we're going to have to do is seek a disgorgement of those funds. And a disgorgement of funds from hundreds, let's say of the 1,500 hundreds of people, is going to be very problematic for ML manager, it's going to be problematic for those investors. A lot of them are elderly. They don't have they put their life savings into this. They'll have no ability to repay it. And that's why I think. How would you allocate the costs of that litigation? Well, we would hope it would. That's a difficulty. I mean, to me, that may very well be a general cost that has to be assessed against all investors because it's not a specific loan. The difference here is a general cost against all investors or loan-specific as to the investors only in that loan. So if somebody has been in a loan, it's been sold, the money has been distributed, and now you're trying to disgorge the money to put back in, it's for the benefit of all of the investors because it would have to flow back into this complicated allocation model and then flow back out again to whatever adjustment we've had to make in the allocation model. So we're talking thousands and thousands of entries in this allocation model after we get the money back from a specific individual. So it's a general cost as opposed to a loan-specific cost. So what you're saying is it wouldn't be possible to sequester some of the money from the future sales, whatever they may be, to repay REVOP for what they were improperly charged. Is that what you're saying? I think at this point that is impractical and not effective. There are only six loans that are left, six properties out of 59. And if they had sought a stay earlier and gotten a stay from distributions or various things, then you might very well have a large pot of money that you could be dealing with in order to do this. But there have been six distributions. The money is out the door. So with six properties left, and in the affidavit of Mr. Winkleman, and I keep referring to it because I anticipated these were going to be your concerns and your questions, and his affidavit reflects that with only six properties left, when you've already sold $200 million worth, with six properties left, it's such a small number, it may be very difficult and you might not be able to do that. And so that's why we have felt that it was not an effective remedy to be able to now do that. The other factors, I think, that come up in the mootness, in case you wanted to go through any of the others, because substantial consummation to me was an effective one, but the other one is the traumatic effect on the third parties. And that I have tried to emphasize. We have 1,500 investors, most of whom are elderly. They put their retirement into this. It is going to have a traumatic effect on those individuals if they're going to be sued for disgorgement. And you can't do that. If you had to write this opinion, and who's going to come out in your favor, how would you distinguish Sutter and Platt? Well, I think I distinguish everything on the facts. I mean, I don't think you have to necessarily add an additional case that decides the case law in the Ninth Circuit. I mean, there are different opinions, just as you said. So either under the Thorpe analysis or under Robert Farms, even if you look at the additional factors, then we very clearly would satisfy all of those factors. So you don't have to decide how you're going to limit or not limit. Just let it sit there and percolate for a little while? Let it continue to percolate. I mean, really, it is fact by case, case by case, fact intensive. And in this case, this is the most egregious. It's taken so long, and money is out the door, the sales have closed. And so there have been a significant change in this landscape for these investors. And it would be traumatic, and it would not be an effective remedy. So that's why I've kind of tried to concentrate on those. I don't know that you need to clarify that, Judge. The other motion that I had was the motion to supplement the record, because I think you can supplement the record with the bankruptcy court docket. That's an easy judicial notice type of standard. You could easily do that. As I said, there are almost 4,000 entries. So to me, you grant the motion to supplement the record. We've included Mr. Winkleman's supplemental affidavit that really just cites back to the record and the specific things in the record to provide some meaning for it. But these are all things that can reasonably be determined based on the record, and so I think you should grant the motion to supplement the record as well. And I ask that you would do that. Now, from here, we have, I think I have about three, four minutes left. I'm not sure where you would like to go. Why don't you go to Limerith? Okay. The motion to clarify to me is one of those things that the judge interpreted his own order. And interpreting his own order, he clearly understood. He had sat for three days of trial. He clearly was in command of the facts. He understood what was going on. He understood the legal issues. And in regards to the clarification, he didn't take or have to take any additional evidence. He had sat through the evidence and the testimony. Now, if you would like, I can easily go back through the plan, the disclosure statement, the confirmation order, the testimony at the actual trial, so that you can see the numerous times where the issue was raised. In my mind, it is crystal clear in the record. Obviously, there's always room for other parties to disagree, if they're going to disagree. But in my mind, and I think in Judge Haynes' mind, it was clear that these costs, which once the allocation model was approved, turned out to be about 3 percent of the loan amounts, that that would be spread across all investors. The argument that ---- Here's the one question that I have, and maybe it's got an easy answer. Maybe I just missed it. But since Revop was allowed to be independent in some respects of the plan and not governed by these LLCs, what benefit do they get from being independent if they're still going to have to pay the costs of everybody? This feels like having to pay union dues but not being a member of the union. And I understand that sometimes that happens in labor law, but it sort of feels like that kind of a situation. Well, I think that starting with the premise that they are independent from the loan LLCs, the point is that they are not. These investors, whether they are in the loan LLC or outside the loan LLC, only own an undivided fractional interest of a note and a deed of trust. Are there any of these properties that Revop was ---- that Revop investors were the sole owners of the property? No. So they had a fractional interest in every one of the properties they owned? They were a minority interest in all of those properties. Was there ever an instance in which Revop objected to some management decision by either the debtor or ML manager that was honored? Where their objection was upheld. Right. In other words, they say, we don't want you to modify the loan in a certain ---- a particular loan in a certain fashion. We don't want you to foreclose on a certain property or sell it at a certain price, and ML manager, when it was in existence or before that, the debtor was in possession, actually honored that request. The ---- I believe the answer is no. When the debtor was in possession, they were trying to remodel several loans that the Revops were in along with all of the other ---- with many of the other investors. And the debtor exercised its sole discretion. It was the committee that had ---- of the investors that had objected to various business decisions of the debtor. And so the committee's decisions or objections were overruled. So the judge still upheld the debtor's business judgment. So now when you turn back to ML manager going forward, the decisions that ML manager made in the motions to sell, the motions to settle, all of those were affirmed by Judge Haynes. They were not reversed or denied. Were they appealed? There were seven of the, say, 50 sales motions that were appealed. And the settlement motions, there may have been two or one that were appealed by the Revops. But they're the only parties that have been appealing or objecting primarily to these things. And Judge Haynes consistently down the road has held that the ML manager has the same time, it has been wisely exercising its best business judgment consistent with the fiduciary duties. And so what we've tried to do is present enough evidence of each one of these so that he realizes that this whole idea of trying to liquidate the properties, gather the money and pay off the investors as much as you can pay them off, is a system that's working. And it is a successful system. Maybe the monies aren't 100 percent of the loan amounts, but it is a system that has dramatically worked. The exit financing was borrowed, but it has now been repaid. And it was initially repaid on the backs of the investors that were in the loan LLCs, both the 350 pass-through investors that transferred in and all nine of the funds, which have about 1,500 investors in them. So they initially repaid the exit financing. And as every subsequent sale came up, they were able to get a portion of their money back from the first sale. The second sale was initially able to get additional money back in the third sale. And the system that we set up and that was explained by Mr. McDonough on the stand at the confirmation hearing is what was implemented and what has effectively worked. So the idea and the concept that all investors share in all of these general costs is one that is fair, it was equitable, we're trying to apply it nondiscriminatorily, and we're trying to do it on the same pro rata basis as we have for all investors. And Judge Haynes thought that concept worked and that that was the right concept. And that's why, with Mr. Sternberg, who was the party that had wanted to make sure that everything was done proportionally, you can tell from his objection to the confirmation, as well as his statements at the hearing on May 18th and on May 13th, 2009, that he was concerned that it would be somehow, maybe we would go out of our way to charge more money to some investors, the pass-throughs. And the idea was, no, we're not charging more money. We're trying to be fair to everybody. And we're trying to make sure that we get through this task in the most efficient  And so that's what Judge Haynes, I think, has recognized. He understands that, and he has been very consistent in his rulings in this case. And I believe I need to stop, and I'm over. You're a little over. It's okay. We've got some flexibility this morning. I appreciate that. Good. Would you put three minutes on for Mr. Suzuki? That will give you your 30 minutes. The 30 seconds you saved and the two and a half minutes that Ms. Reese went over will allocate equal time here. Thank you, Your Honor. Let me take, I think, four things, based on the argument that was presented by Ms. Reese. With respect to this contention that Judge Haynes, you know, views this to be, you know, some kind of grand equitable scheme and that he understood that to be the case, that is part of the issue here. The issue is not what the judge thinks works or what the judge thinks is equitable. The challenge here is to enforce a plan, which your precedent at this Court says is like unto a consent decree and should be enforced under principles of contract interpretation. And the question is, what was the deal that was struck? Is that settled law in this circuit? That is settled law in this circuit, Your Honor. Now, with respect to whether a judge is interpreting his own confirmation order, this Court has never addressed that as a contested issue. But here's the point on that, Your Honor. This was not the judge's own order. And if you look at the disputed provision, it was implementing a plan modification. It was they could have just as well filed a stipulation where the parties agree the plan will be modified as follows, and the judge enters an order that says so ordered. It's the same effect. The fact that that agreement, and it says flat out, pursuant to the agreement of Mr. Sternberg and the plan proponent, the plan shall hereby be modified as follows. And then it lists the modifications. But there were extensive hearings and arguments about the confirmation of the plan and the implementation of the plan and everything that went into it. I mean, this wasn't a judge starting from an agreed order that was rubber stamped. I mean, that's sort of what you're suggesting. This was a judge who had a lot of experience. And if you read his various rulings, I mean, he keeps going back and referring to the litigation that had preceded all of these orders. So I think it's sort of unfair to just say that he was just rubber stamping something. And I wouldn't disagree with Your Honor at all with respect to findings that he made at the hearings, at the plan confirmation hearing conclusions. But this truly was a deal that was cut in the back of the courtroom and in e-mail communications on the phone over the weekend. And it was implemented and read into the record. The judge really isn't interpreting his own order. He's interpreting a deal that the parties cut. Let me move to the other points here. With respect to the distributions and whether, and the case law says you should approach equitable mootness with a scalpel rather than a hammer. With respect to the distributions, first of all, this is one of those cases where even if it is moot, and we don't think it is, it is capable of repetition but evades review. And at a minimum, I think this Court could provide an equitable remedy that says from here forward, you can't ding them for proportionate shares of exit financing. Disgorgement, difficult remedy, perhaps. I don't think it should be off the table. There is a true-up function built into the allocation model. And that true-up function, for example, if I was in the first loan and I received all my distributions, I received an overdistribution because they kept increasing costs over the life of the other subsequent distributions. And most of the investors are in multiple loans. Most of them are in nearly all of the loans if you count the pool fund investors. So to say that it would be inequitable to true-up those distributions, I think, misses the mark. And again, unfortunately, I find myself out of time here. Okay. Thank you, counsel. I realize you're up first next. On the next case, we'll give you just a minute to gather your notes and get a drink of water. Allow everybody to swap out here.
judges: Gettleman, Wallace, Bybee